Signed and Filed: January 17, 2013



_____
**DENNIS MONTALI**
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 10-14387 |
| ZIBA SOHAEI, aka ZIBA POURIAN aka SOHAEI INTERIOR DESIGN, | ) |
| | ) Chapter 7 |
| Debtor. | ) |
| ELAINE BANDALIN, | ) Adversary Proceeding |
| | ) No. 11-1040DM |
| Plaintiff, | ) |
| v. | ) |
| ZIBA SOHAEI, aka ZIBA POURIAN aka SOHAEI INTERIOR DESIGN, | ) |
| Defendant. | ) |

MEMORANDUM DECISION FOLLOWING TRIAL
TO DETERMINE DAMAGES

I. INTRODUCTION

In May 2012, this court awarded partial summary judgment in favor of plaintiff Elaine Bandalin ("Bandalin") (May 9, 2012; Docket No. 87) holding that representations made to her by or on behalf of defendant Ziba Sohaei ("Sohaei") in written disclosures relating to Bandalin's 2006 purchase of Sohaei's house in San Rafael, California (the "Property") were false; that Bandalin justifiably relied on those representations; and that Bandalin was

-1-

damaged as a result of those representations.  On June 11 and 12, 2012, the court conducted a trial on two other issues relating to nondischargeability, namely whether Sohaei herself made false representations of material fact and whether Sohaei intended to deceive Bandalin.  Following trial the court issued findings of fact and conclusions of law in a Memorandum Decision re Certain Elements of Nondischargeability Under Section 523(a)(2)(A) (July 6, 2012; Docket No. 98), determining both issues in favor of Bandalin.

At that point Bandalin had established every element of nondischargeability under 11 U.S.C. § 523(a)(2)(A) apart from the amount of her actual damages.  Trial on the damages phase occurred on December 10, 2012, after which closing arguments were presented by counsel for Bandalin and by Sohaei, representing herself.  The court then took the matter under advisement.

As explained below, only Bandalin's expert takes into the account estimated cost of repairs when valuing the Property, and thus the court finds his valuation more persuasive (albeit subject to adjustments described later).  After weighing the competing evidence, the court finds that Bandalin has been damaged in the sum of $259,803.67 and that she is entitled to judgment of nondischargeability under 11 U.S.C. § 523(a)(2)(A) against Sohaei in that amount.[1]

---

[1] After trial, Sohaei moved to re-open in attempt to discredit Bandalin's appraiser, contending that he had misrepresented himself as a member of the Appraisal Institute. That motion is DENIED.  The appraiser did use the initials "MAI, SRA" after his name, but clearly stated that he was an associate member, and not a member, of the Appraisal Institute.  The court was not misled.

II. DISCUSSION[2]

   A. <u>Governing Law</u>

Bandalin states on page 4 of her trial brief that the gravamen of her nondischargeability action is Sohaei's violation of the disclosure requirements of California Civil Code sections 1102 *et. seq.* Bandalin acknowledges on the same page that California Civil Code section 3343 ("§ 3343") provides the "*exclusive* measure of damages for the intentional violation of the disclosure requirements of Civil Code section 1102." Section 3343 provides, in relevant part:

> (a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following:
>
> > (1) Amounts actually and reasonably expended in reliance upon the fraud.
> >
> > (2) An amount which would compensate the defrauded party for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud.
>
> * * *
>
> (b) Nothing in this section shall do either of the following:
>
> > (1) Permit the defrauded person to recover any amount measured by the difference between the value of property as represented and the actual value thereof.
> >
> > (2) Deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled.

Cal. Civ. Code § 3343.

In 1971, the California legislature revised § 3343 to adopt

---

[2] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

-3-

an "out-of-pocket" means of measuring damages and to reject a "benefit-of-the-bargain" approach. The California Supreme Court has explained the differences between the two approaches:

> [T]he cornerstone of the California standard for the assessment of damages for fraud in property transactions has been the so-called "out-of-pocket" rule. This rule, against which is traditionally contrasted the so-called "benefit-of-the-bargain" measure, is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received. The "benefit-of-the-bargain" measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive.

Stout v. Turney, 22 Cal. 3d 718, 725 (1978); see also Saunders v. Taylor, 42 Cal. App. 4th 1538 (1996) (term "actual damages" within meaning of damages recoverable for deceit in sale of property means compensatory damages, rather than damages as measured by benefit-of-bargain rule). In other words, the "out-of-pocket" measurement of damages relies on objective criteria (such as market value) and not on subjective expectations of the defrauded party. Generally, a defrauded plaintiff is "out-of-pocket" the purchase price and is entitled to recover the difference, if any, between that amount and the actual value of what was received.[3]

---

[3] In addition to permitting a defrauded plaintiff to recover the difference between the value given and the value received, subsections (a)(1) and (2) of § 3343 permit recovery of amounts "actually and reasonably expended in reliance upon the fraud" and "an amount which would compensate the defrauded party for the loss of use and the enjoyment of the property to the extent any such loss is proximately caused by the fraud." Here, as discussed later, Bandalin has *actually* and reasonably expended only $9,803.67 as a result of the fraudulent representations. The

-4-

Here, Bandalin is "out-of-pocket" the amount she paid for the Property and is entitled to recover the difference, if any, between that amount and the actual value of what she received. The actual value with which Bandalin parted is known: she paid $1,850,000 (the "Purchase Price") for the Property on September 28, 2006 (the "Purchase Date"). The trial focused on the second aspect of the test for damages: what was the actual value of the Property on the Purchase Date?

To determine "value," the court considers the fair market value of the property as of the sale date. <u>Nece v. Bennett</u>, 212 Cal. App. 2d 494, 497 (1963). While cost of repairs has some probative worth on the issue of value, it is not of itself the proper measure of damages. <u>Central Mut. Ins. Co. v. Schmidt</u>, 152 Cal. App. 2d 671, 676-677 (1957). Here, the court's determination of the actual value of the Property as of the Purchase Date takes into account the estimated cost of repairs, as the most persuasive evidence of value presented at trial is based on these estimated costs.

B. <u>The Calculation of Damages</u>

A critical issue in this case pertains to the effect on the Property of improvements Sohaei made in 2005-2006. Sohaei retained an architect for the remodel (Stipulation of Undisputed Facts ¶ 30). Among other things, she expanded the kitchen-dining area and widened a doorway by removing walls and inserting a heavy beam to support a vaulted ceiling in that area. Bandalin contends

---

court will award that amount as consequential damages under § 3343(a)(1). As Bandelin has resided in the Property since 2006, she is not entitled to damages under under § 3343(a)(2) for "loss of use or enjoyment" of it.

-5-

that these and other changes altered the existing floor and roof loads and that the foundation for the Property was not upgraded to meet those new loads.[4] Both she and her appraiser relied on the report of geotechnical engineer, Lawrence B. Karp ("Karp"), who asserts that the remodel concentrated loads and the failure to upgrade the foundation will result in settling and shifting and render the Property vulnerable to damage in an earthquake. Sohaei, her appraisers, and the consultants upon whom they rely dispute Bandalin's contentions, asserting that there is no issue with the foundation.

The purpose of the trial was to determine the actual value of the Property, and not to determine the actual condition of the foundation, whether or not loads had shifted, or whether or not the Property was more or less vulnerable to earthquake damage following the remodel. The critical point here is that only Bandalin's expert considered the impact of the remodel or the reports of the soil and structural experts called by both sides; nothing in the record indicates that Sohaei's experts did.

As noted earlier, the court's determination of damages starts with a comparison of the Purchase Price with the "actual value" of the Property received by Bandalin. In other words, if the

---

[4] The City of San Rafael issued the requisite permits for the remodel. Nonetheless, Bandalin questions the validity of those permits, contending that the City itself contracted out to a third party the approval of the remodeling plans, and that third party is situated in San Diego, California, where building over San Francisco mud does not occur. There is no evidence in the record to indicate whether or not the people who approved the plans on behalf of the City of San Rafael were or were not familiar with the actual conditions at the Property. Therefore the court rejects that contention of Bandalin. In any event, the issuance of a permit does not preclude a decline in value if a remodel is faulty or inadequate.

-6-

Case: 11-01040    Doc# 153    Filed: 01/17/13    Entered: 01/17/13 15:58:42    Page 6 of 18

Purchase Price equals or is less than the actual value received, there is no damage. This is precisely what Sohaei and her two real estate appraisal experts contend, namely that at the time Bandalin purchased the Property, it was worth the Purchase Price. They used the traditional appraisal method for residential real property, namely the adjustment by the appraiser of the actual sales prices of comparable properties upward or downward to equate with the "subject" property.[5]

The first of Sohaei's appraisers, Mr. Arthur M. Crofts ("Crofts"), conducted a retrospective appraisal of the Property in 2009 to opine on its value as of the Purchase Date.[6] Crofts used the traditional comparable method, adjusting the value of the Property up or down compared to five comparable (according to him) sales within 3/10th of a mile to approximately 2-1/3 miles from the Property. He concluded that as of the Purchase Date the Property was worth the Purchase Price.

For the current trial, Crofts republished his 2009 appraisal and, after visiting the Property in September, 2012, reached the same conclusion. In preparing his report he relied on several sources, including correspondence to Sohaei from Arthur J. Lang ("Lang"), a civil engineer, and Peter Nissen ("Nissen"), a registered professional consulting engineer. Crofts did not

---

[5] A traditional "comparable" appraisal frequently involves value judgments by the competing appraisers over necessary adjustments, based upon such variables as location, view, traffic, square footage, number of rooms, overall condition, and any other number of factors.

[6] The appraisals submitted by both parties were retrospective, as the experts looked backward in time to opine on the value as of an earlier date.

-7-

Case: 11-01040   Doc# 153   Filed: 01/17/13   Entered: 01/17/13 15:58:42   Page 7 of 18

review or consider Karp's report or the report of a structural engineer specializing in seismic structural engineering, Thomas H. Lutge ("Lutge").

Crofts emphasized in his testimony that his parents live near the Property and that he had lived with them for several years and was familiar with the floor plan of the Property as being virtually identical to that of his parents' home, at least prior to the improvements made by Sohaei in 2005-2006. Crofts was inconsistent about his awareness of one of the critical facts in this case, namely the location of the Property on between six and twenty feet of landfill on top of San Francisco Bay mud. At one point he said that he was not aware that the Property was built on such fill and mud, and at other points in his testimony he indicated that everyone in the neighborhood of the Property knew that that was the case.

Sohaei's second appraiser, Curtis A. Thor, Jr. ("Thor"), approached his assignment in much the same way as Crofts did. First, he appraised the Property in April 2009, and opined that as of the Purchase Date it was worth the Purchase Price. For this trial, he republished his 2009 appraisal and reached the same opinion. He considered the reports of Lang and Nissen, correspondence from two general contractors who visited the Property with him, as well as comments of Ms. Lillie Mozassari, the engineer of record during the 2005-2006 remodel. He did not consider Karp's or Lutge's reports. He (like Crofts) also considered comparables (three instead of five as had Crofts), two of which were also considered comparable by Crofts.

The trial was limited to the question of value of the

-8-

Property as of the Purchase Date, and not whether in fact there were structural or foundational problems. Nevertheless, the court finds it surprising that neither Crofts nor Thor even considered the Karp and Lutge reports. Accordingly, the court has little confidence in their appraisals and finds less than convincing the values they determined. By the preponderance of the evidence the court accepts the assertions of Bandalin's expert, subject to the serious limitations and significant reductions explained below.

Bandalin relied on William R. Lemas ("Lemas") as her expert to perform a retrospective appraisal of the Property as of the Purchase Date. Lemas first reviewed an October 2, 2006, appraisal obtained by Bandalin that accepted the Purchase Price as the appraised value of the Property, assuming the buyer had been provided with all of the information necessary to make a knowledgeable decision.

While Lemas does not identify specifically the 2006 appraisal in his oral or written testimony, he does note that it used three comparable sales located in more expensive areas of San Rafael and that he (Lemas) researched and reviewed each comparable sale and other comparable sales in the neighborhood of the Property that sold for considerable lower amounts. To quote Lemas,

> [I]t appeared to me in reconstructing the original appraisal that [the Property] may have been over-appraised in October, 2006. Although this was <u>not</u> factored into my retrospective appraisal, it indicated to me that <u>the price may not have been reasonable</u> in the first place."

Lemas declaration in lieu of live testimony at 5:28-6:4 (emphasis in original).

What troubles the court here is that although Lemas said that

-9-

the 2006 appraisal was not factored into his retrospective appraisal, in fact it was. Significantly, he accepted the Purchase Price as his starting point as the market value from which he adjusted downward.

Rejecting the comparable appraisals method, Lemas instead utilized an appraisal theory and methodology established in treatises and other writings by Randall Bell ("Bell"), <u>Real Estate Damages</u>, Appraisal Institute (2d ed.) and other materials accompanying Lemas' declaration. In short, the Bell methodology can be described as a "cost to cure" approach based upon adjustments to the starting point by what Bell, and therefore Lemas, identifies as "Detrimental Conditions." Detrimental Conditions are taken into account to determine a diminution in value that would involve a review of the function and utility of the subject property, the repairs that are necessary to prevent a loss of life or property, repair costs, engineering costs, disruption to the property, and so forth. (See Exhibit A to Lemas declaration at p. 385). The most significant Detrimental Conditions identified by Lemas for the Property fall within Bell's "Class VII, Soil or Geotechnical Construction Conditions."[7]

Lemas considered a June 13, 2009, letter from geotechnical engineer E. Vincent Howes ("Howes"). Howes described his investigation of settlement at the Property and his evaluation of

---

[7] "While Crofts and Thor dismiss Lemas' approach, to such an extent that one of them even refuses to acknowledge it as an appraisal, Sohaei made no motion to exclude Lemas' testimony under <u>Kumho Tire Co., Inc. v. Carmichael</u>, 526 U.S. 137 (1999), and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). The court does not independently reject the approach out of hand.

-10-

the geologic and soil conditions, settlement potential and other features relating to his speciality, geotechnical engineering and engineering geology. Howes made two borings that confirmed that the Property was underlain by six feet of hard fill over twelve to sixteen feet of San Francisco Bay mud. He indicated that such construction on land of this nature is susceptible to stability problems, and in Marin County that situation has caused great distress to individual citizens because of continuing subsidence of fills and being subject to lateral flow.[8] He concluded that the nature of the construction at the Property was consistent with the standard of practice in the 1950's and 1960's (when the Property was built) but that changes in loading in the past ten years would indicate a need for remedial foundation work to prevent renewed settlement. He did not opine as to whether that remedy was absolutely required or just desirable, but simply identified a possible solution. There is no indication in Howes' letter how much he was paid for his work.

Lemas also relied on Karp's declaration. Karp identified himself as a civil engineer and geotechnical engineer and set forth his qualifications as an expert on soil and foundation engineering and construction, ground support systems and related matters. He was retained by Bandalin in 2008 to evaluate the supporting soil at the Property and the interaction of that soil with the construction and the remodel. Karp explained that the Property does not have an integrated foundation system, but

---

[8] He discounted any particular risk of liquefaction during a severe earthquake, as that occurs only in ground underlain by fanned deposits, apparently not present at the Property.

-11-

consists of 1950 style perimeter strip foundations and isolated interior pier blocks. He concludes that the 2005-2006 remodel created new concentrated loads and believes changes should have been made rather than leave the existing minimal foundation in its then condition. The Karp report describes other conditions and endorses the Lutge report described below. He opines that in a moderate to severe earthquake, expected shaking -- amplified by the fill and soil -- would cause a progressive failure "particularly because of the redistribution of loads that concentrate them at points which were not designed to resist lateral loading."

Karp does not state how much he was paid for his report.

Lemas also relied in his appraisal on Lutge's declaration. Lutge is a registered civil and structural engineer and sets forth his suggestion for a remedial foundation which would involve integrating and tying together the foundation and installing helical piles to be screwed into the rocks beneath the mud.

Lutge does not opine that the Property is presently uninhabitable but only that there is a significant danger of seismic collapse at the time of an earthquake. He does not predict the magnitude of any such earthquake that would cause that collapse and, of course, the court has no way of knowing what that magnitude would be or when it might occur.

Lutge does not say that his recommended repairs are absolutely necessary to prevent the loss of life or property. Finally he does not indicate how much he was paid for his report.

Exhibit G to the Lemas declaration is a September 3, 2009 "Project Proposal" from McCarthy Construction, proposing to do the

-12-

work proposed by Lutge and other related work for $488,620. There was no indication that McCarthy Construction charged for its proposal.

What is troublesome about Lemas' methodology is that having dismissed as perhaps too high or unreasonable the Purchase Price, he then concludes that if the detrimental geotechnical conditions were known, his market value is determined by deducting certain "costs" from the $1,850,000 starting point. Lemas deducts from the Purchase Price certain costs, many of which are speculative, some of which would result in Bandalin receiving "benefit-of-the-bargain" damages instead of "out-of-pocket" ones, and some of which -- while permissible -- constitute consequential damages that are irrelevant to value.

Ultimately, Lemas adjusted the Purchase Price by including expenses set forth in the McCarthy Construction proposal, expenses apparently incurred by Bandalin which would affect market value and somehow be attributable to Sohaei, and a $190,000 "cost" based upon non-licensed construction work. The court believes that only one of these "costs" -- the estimated cost to repair the property -- is relevant to a determination of value. The remaining costs, to the extent they are reasonable and actual, should not be included in the valuation, but instead awarded as consequential damages under § 3343(a)(1).

   1. *Factors Relevant to Valuation*

As noted previously, a court can consider the need for and the cost of repairs in determining the "actual value" of property the property received by a defrauded purchaser. <u>Central Mut. Ins. Co. v. Schmidt</u>, 152 Cal. App. 2d at 676-677. Here, Bandalin has

-13-

submitted evidence of a need to make repairs to ameliorate conditions that were misrepresented by Sohaeii. In estimating the costs of such repairs, Lemas relied on and incorporated a bid by McCarthy Construction. This bid ($488,620) is too vague to be reliable and, more importantly, none of the work has been done. This raises the question of whether McCarthy Construction's bid is nothing more than a "wish-list" for Bandalin to have a fully functionally risk-free home at Sohaei's expense.

Lemas also deducts $190,000 from the Purchase Price as a cost for non-licensed construction work. There is no competent evidence or even facts cited by Lemas to justify this speculative reduction in value. Similarly, Lemas reduced the Purchase Price by 10% for "project incentive adjustments." This adjustment is not justified or supported by the evidence, and is based upon 10% of the Purchase Price that Lemas himself suspects. The court will make no adjustment for this category.

Lemas also makes a speculative adjustment of $71,510, an arbitrary 10% of the already questionable cost to repair $715,024. This appears to be speculation on top of speculation and the court will allow no adjustments in this category.

Lemas also deducts estimated carrying costs during repairs. Lemas assumes a two month vacancy from the Property while repairs are made and calculates mortgage expense, taxes and insurance without any indication of the source of those figures. Again, since no repairs have been performed it is impossible to do more than speculate on what Bandalin's own carrying costs would be. There will be no adjustments for this category. Similarly, the court will not make an adjustment for estimated moving and housing

costs.

Finally, Lemas adjusted the Purchase Price for "market resistance." He offers no satisfactory explanation for this adjustment, and the court will not consider this factor in this valuation, particularly as this appears to be relevant only if Bandalin were entitled to the benefit of her bargain as opposed to her out-of-pocket costs.

In short, Lemas appears to factor in several components that are speculative and that incorporate work that has not and may not ever be performed. Quite significantly, Bandalin has lived at the Property since 2006, so it can hardly be the imminent threat that Karp and Lutge suggest. Lemas' approach strikes the court as a indirect way to reward Bandalin with the "benefit of the bargain" formula which has been rejected by the California legislature and courts. <u>Stout v. Turney</u>, 22 Cal. 3d at 725. Nonetheless, the court is convinced that, upon weighing the evidence presented by both parties, the actual value of the Property on the Purchase Date was at least $250,000 less than the Purchase Price, given the apparent necessity for remediation. Thus she is entitled to no less than that amount under § 3343.

*2. Consequential Damages*

As noted previously, Lemas deducted from his valuation other costs that should be considered separately as consequential damages. The court will address these component parts separately.

**Bandalin's Own Expenses:** Some of Bandalin's own costs to repair have nothing to do with the misrepresentations made by Sohaei and Bandalin's reliance on these representations. There is no evidence to support any of them, nor is there reason to believe

-15-

that most of them could possibly relate to the Detrimental Conditions Lemas focuses on. Those costs run the gamut from "address rodent infestation" ($175) to "install window screens" ($157.33) to replace defective "cook top" ($1,585.86). A careful and generous review of Exhibit H to the Lemas declaration shows only the following charges totalling $4,803.67 that <u>could possibly</u> come within § 3343(a)(1) or (2):

| | |
|---|---|
| Inspection | $ 680.00 |
| Electrical Safety Inspection | $ 280.32 |
| Electrical Repairs | $2,058.17 |
| Electrical Repairs | $ 210.45 |
| Electrical Repairs | $1,447.40 |
| Plumbing Inspection | $ 127.33 |
| TOTAL | $4,803.67 |

**Cost To Assess The Situation - $14,900**: Notwithstanding the submission of the reports described above, Lemas' method for calculating the cost of assessments is a mystery. He attributes $3,000 to the bid proposal by McCarthy Construction without even suggesting that someone bidding to perform a half a million dollar contract would charge a prospective client $3,000 to submit the bid. While it is reasonable to assume that Howes and Lutge expected to be and in fact were paid for their work, there is no basis in evidence to justify Lemas' adjustments. The most the court can allow here as a component for the cost to cure is $5,000, believed to be what Lemas was paid.

III.  CONCLUSION

The court believes that the difference between the Purchase

-16-

Price ($1,850,000) and the actual value of the Property on the Purchase Date ($1,600,000) is $250,000. In addition, the court believes that the actual and reasonable expenses incurred by Bandalin as a result of Sohaei's misrepresentations is $9,803.67 ($4,803.67 + $5,000). The sum of all three amounts, $259,803.67, constitutes the amount of damages to which Bandalin is entitled in a nondischargeability judgment against Sohaei.

III. CONCLUSION

Counsel for Bandalin should submit a form of judgment that recites that based upon the court's May 9, 2012 partial summary judgment, its July 6, 2012 Memorandum Decision, and this Memorandum Decision, judgment is entered in Bandalin's favor against Sohaei in the sum of $259,803.67 plus Bandalin's costs which judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(A).[9]

**END OF MEMORANDUM DECISION**

---

[9] Bandalin's counsel has confirmed that she does not seek attorneys fees. Prejudgment interest would not be appropriate.

```
 1                       COURT SERVICE LIST
 2   Ziba Sohaei
     23 Humboldt Ave.
 3   San Anselmo, CA 94960
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```